***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence affirms in part and reverses in part the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between the parties at all relevant times.
3. Defendant is self-insured. At the time of the alleged injuries, the servicing-agent was Alexsis. Prior to the hearing, Alexsis merged with RSKCo and since that time RSKCo has been the servicing-agent for defendant on this claim.
4. The dates of plaintiff's alleged injuries are 25 June 1995 and 14 May 1996.
5. Plaintiff's average weekly wage at all relevant times was $199.68.
6. The parties also submitted packets of stipulated exhibits as follows:
a) NCIC Forms 18, 19, 61, 28B, 21, 33, 33R
b) Medical Records (222 pp.)
c) Time and Wage sheets (34 pp.)
d) Employment file (102 pp.)
e) Discovery Documents
f) Unemployment Printout (1p.)
g) Social Security Documents (2pp.)
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 49 years old and a certified nursing assistant (CNA). Defendant New Hanover Regional Hospital hired plaintiff in 1988 as a CNA.
2. On 25 June 1995, plaintiff was assisting a 280 pound patient to the bathroom when the patient began to fall. While attempting to catch the patient, plaintiff fell injuring her right shoulder and back. Over the next several hours plaintiff experienced low back pain of such severity that she sought medical treatment.
3. Following the 25 June 1995 accident, plaintiff presented to Employee Health Services at New Hanover Regional Medical Center with complaints of low back and right shoulder pain. X-rays were taken which were negative and plaintiff was written out of work until 29 June 1995, at which time she could return with temporary restrictions of no lifting more than 15 pounds, no heavy pushing or pulling, no standing or sitting for long periods, no repetitive stooping, bending or squatting, and no patient lifting or transfers. Plaintiff was provided with pain pills and referred to Dr. James Warren Markworth, an orthopedic surgeon with Southeastern Orthopedics. Plaintiff returned to work on 3 July 1995.
4. Plaintiff had her first appointment with Dr. Markworth on 19 July 1995. At that time, she presented complaining of pain throughout her right shoulder and some periodic pain and swelling of the right hand, paresthesia extending to all four fingers of the right hand, occasional inability to use the hand and arm on the right side and occasional radiation of pain from her back into her right thigh. Dr. Markworth ordered an MRI of plaintiff's right shoulder which could not be completed as plaintiff was claustrophobic. He later performed an arthrogram which was negative. Dr. Markworth restricted plaintiff to light-duty, sedentary work.
5. Plaintiff returned to work and was placed in various jobs to accommodate her restrictions, including lab work, delivering blood samples, and passing out ice and lotions in the rehabilitation area.
6. On 23 October 1995, Dr. Markworth again saw plaintiff after she was examined by a urologist for bladder problems. Dr. Markworth was of the opinion that plaintiff's bladder dysfunction was unrelated to her work injury. On 5 February 1996, Dr. Markworth provided plaintiff with a TENS Unit for relief of pain. Plaintiff continued to be able to work light-duty only.
7. On 24 April 1996, Dr. Markworth re-examined plaintiff and diagnosed her with "persistent shoulder and arm pain of unknown etiology." He assigned plaintiff a permanent partial disability rating of 2% to her right upper extremity based on her continuing pain. Dr. Markworth concluded that plaintiff would not be able to return to the duties of a CNA, but recommended that she continue doing sedentary work.
8. On 15 May 1996, plaintiff returned to Dr. Markworth with complaints of continued swelling in the right hand and right shoulder which occurred frequently. Plaintiff noted that she had lifted a heavy package at work the day before, and felt that this may have precipitated the current swelling. Plaintiff was advised to continue her medications and to place ice on the swelling. No change was made in plaintiff's medications or work restrictions.
9. On 12 June 1997, plaintiff filed with the Industrial Commission a Form 18 Notice of Accident to Employer alleging that the lifting incident in May 1996 aggravated her condition resulting from the prior injury. This claim was assigned the number I.C. 721983.
10. Plaintiff was next examined on 19 June 1996, in follow-up to the 15 May examination. For the first time, Dr. Markworth noted that plaintiff had a positive Tinel's sign, indicative of the possibility that plaintiff was suffering from carpal tunnel syndrome. Dr. Markworth indicated that a nerve conduction study would be "worthwhile." Plaintiff returned to Dr. Markworth on 20 August 1996, at which time her symptoms had increased. Plaintiff complained of waking with pain, numbness and paresthesia in her right hand and right leg pain which radiated into the right foot. Dr. Markworth's examination revealed a positive Tinel's for carpal tunnel syndrome in the right wrist. He opined that plaintiff's upper extremity symptoms may be secondary to the carpal tunnel syndrome but he was not sure if the right leg symptoms were sciatica or peripheral neuropathy. He again expressed in his notes that nerve conduction and EMG studies were needed.
11. During the time plaintiff's was being treated by Dr. Markworth, Ms. Michelle Hertzler, an employee of New Hanover Regional, became actively involved in plaintiff's medical treatment. She made numerous calls to medical providers and sent plaintiff for additional assessments with Dr. John C. Liguori and for a psychological evaluation by Dr. Christi L. Jones.
12. In June 1996, plaintiff saw Dr. John C. Liguori, Physiatrist. Plaintiff presented complaining that her right arm felt dead and mentioned having pain in her lower back. Dr. Liguori found no evidence that plaintiff had anything physically wrong with her at all; therefore, he did not recommend any treatment. Dr. Liguori did not assign any work restrictions. On 18 October 1996, plaintiff again saw Dr. Liguori. She complained of arm and hand pain, and that she had been unable to use her right arm. Following his examination, Dr. Liguori maintained his earlier position that he could find nothing wrong with plaintiff.
13. Dr. Liguori testified that at the time he examined plaintiff, he did not have Dr. Markworth's records regarding his testing for carpal tunnel syndrome and did not examine plaintiff for signs of carpal tunnel syndrome. He further stated that he had no opinion regarding the possibility that plaintiff suffers from carpal tunnel syndrome. For this reason, the Full Commission assigns less weight to the opinion of Dr. Liguori than to that of Dr. Markworth.
14. In March 1997, Ms. Cheryl Knolls, plaintiff's supervisor at the time, placed plaintiff in a light-duty position as a distribution clerk. While the job of distribution clerk is a real position, it normally requires activities outside of plaintiff's restrictions. Ms. Knolls testified that she "basically kind of created a position for [plaintiff]." In order to meet plaintiff's restrictions, her job duties were culled from those of existing positions and were limited to delivering small packages to areas of the hospital using a service cart with four wheels on it. Plaintiff worked night shift when the need for delivering packages was the lightest. The distribution clerk position allowed plaintiff to both sit and stand. When plaintiff ultimately left the position of distribution clerk, the duties she performed were merged back into existing positions and her job was not refilled.
15. Based upon the greater weight of the evidence, the Full Commission finds that the duties assigned to plaintiff in the position of distribution clerk made it a "make-work" position which was not available in the competitive job market and thus was not indicative of plaintiff's wage-earning capacity.
16. Plaintiff had difficulty performing the job of distribution clerk. She did not always deliver packages to the correct locations, and she frequently failed to secure the requisite signatures on delivered packages. Plaintiff received a number of warnings for her errors. On 6 March 1997, plaintiff received a verbal warning, documented by defendant, for failing to properly deliver a package. Plaintiff did not deliver the package to the proper person or obtain the required signature. On 18 March 1997, plaintiff also received a verbal warning, documented by defendant, for failing to obtain the necessary signatures on the packages.
17. On 11 April 1997, plaintiff informed defendant that she was quitting. Plaintiff sent a letter giving two weeks notice and saying she was quitting due to "personal reasons." Four days later, plaintiff sent a letter rescinding her resignation.
18. Plaintiff was verbally warned on 5 May and 8 May 1997, as documented by defendant, that she needed to become more efficient in her job delivering packages. Similar warnings were received by plaintiff on 9 May 1997 and again on 12 May 1997. Plaintiff was given a verbal warning on one other occasion after 12 May 1997. Plaintiff was retrained by defendant on how to do the job during the week of 28 May 1997. On 3 June 1997, defendant terminated plaintiff from employment for failure to competently perform her job.
19. There is no evidence of record that plaintiff purposely failed to perform her job or that she willfully or constructively refused to perform the job duties assigned. Further, as the employment in question is deemed a "make-work" job, plaintiff's termination does not constitute a constructive refusal of suitable employment.
20. Plaintiff next went to work for Elder Care. She worked four hours a day, two days a week and earned $8.50 an hour. Plaintiff was limited to performing paper work, as her restrictions prevented her from working with patients. Plaintiff worked for Elder Care until August 1997. Plaintiff testified that she was terminated from that employment because her condition prevented her from working directly with patients.
21. Following her leaving Elder Care, plaintiff received unemployment benefits for a period of time in the total amount of $3,494.00. Thereafter, plaintiff obtained a job with Hospice as a CNA. Plaintiff worked four hours a day, five days a week and earned $9.00 an hour. Plaintiff did not apprise Hospice of her restrictions prior to her hiring, but informed them later. Plaintiff testified that she was terminated from her employment with Hospice after a patient in her care fell and plaintiff was unable to hold him up due to the weakness in her arm.
22. Plaintiff has continued to seek treatment of her right upper extremity pain in a clinic setting, but is unable to pay for any treatment beyond medication.
23. Because plaintiff's condition of right upper extremity pain has persisted since the date of her injury by accident and the medical records did not adequately address the issue of causation, the Full Commission on 13 September 2002, ordered that the record be reopened in this case for the admission of additional evidence in the form of an Independent Medical Examination of plaintiff. The matter was referred to the Industrial Commission Nurses' Section to arrange an appointment for plaintiff with orthopedist, Dr. Richard Moore. On 20 December 2002, Dr. Moore examined plaintiff as well as the records of her prior medical treatment by other physicians. He noted that plaintiff's right arm exhibited signs of chronic use of a splint, with slight subtle forearm atrophy. Dr. Moore's impression at that time was that plaintiff suffered from "chronic right upper extremity pain of unclear etiology." He noted that electrical studies which had been previously recommended, but not performed, were needed. Pursuant to an Order of the Full Commission, these tests were scheduled.
24. The EMG and NCV studies recommended by Dr. Moore were performed on 16 January 2003. Dr. Moore reviewed the studies and found "evidence of severe right carpal tunnel syndrome" and "mild right ulnar neuropathy at the elbow with focal slowing in the retrocondylar groove." He further noted a possibility that plaintiff suffers from a "chronic regional pain syndrome." Dr. Moore recommended carpal tunnel release surgery. Plaintiff is currently determining whether to undergo the surgery. Dr. Moore is of the opinion and the Full Commission finds that plaintiff's carpal tunnel syndrome and right upper extremity problems are causally related to her June 1995 injury.
25. Dr. Moore's diagnosis of carpal tunnel syndrome and mild right ulnar neuropathy is given greater weight by the Full Commission than the contrary opinions of plaintiff's other treating physicians who did not have the benefit of the electrical testing which Dr. Moore considered.
26. The record contains a Form 21 Agreement for Compensation dated 18 June 1996 in I.C. No. 558162, wherein defendant admitted liability and agreed to pay plaintiff compensation for 4.8 weeks based upon a permanent partial disability rating of "2% to the arm, plus one week waiting period" pursuant to the rating plaintiff received from Dr. Markworth. The Industrial Commission approved the Form 21 on 3 April 1997.
27. Plaintiff's claim is not a change of condition. The make-work jobs provided by defendant-employer were not indicative of plaintiff's wage earning capacity and none of plaintiff's subsequent attempts to work have established wage earning capacity. Therefore, plaintiff has proven that she remained temporarily totally disabled after reaching maximum medical improvement. Even if plaintiff must show a change of condition, the new claim (Form 18) she filed on 12 August 1997 for aggravation of her compensable injury by accident satisfies the filing requirements of N.C. Gen. Stat. § 97-47. The new Form 18 alleged a new injury or aggravation date of 14 May 1996; however, the Full Commission finds that plaintiff's carpal tunnel syndrome and upper extremity problems are causally related to the 25 June 1995 injury rather than lifting the package on 14 May 1996.
28. Plaintiff's average weekly wage at all relevant times was $199.68 per week yielding a compensation rate of $133.12.
29. Plaintiff's current disability is causally related to the June 1995 injury by accident and the subsequent aggravation of her condition on or about May 1996. Plaintiff has not reached maximum medical improvement in this claim.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission hereby enters the following:
 CONCLUSIONS OF LAW
1. On 25 June 1995, plaintiff sustained an injury by accident arising out of and in the course of her employment, which resulted in an injury to her right arm and back. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff had an average weekly wage of $199.68 per week at all relevant times, which yields a compensation rate of $133.12. N.C. Gen. Stat. § 97-2(5).
3. Plaintiff's current conditions of carpal tunnel syndrome and chronic right upper extremity pain are either caused by or are the direct and natural consequence of her compensable injury of 25 June 1995, which was aggravated by lifting a package at work on 14 May 1996. Accordingly, plaintiff is entitled to indemnity compensation for the loss of wage earning capacity as a result. N.C. Gen. Stat. § 97-29.
4. Plaintiff's various light duty positions with defendant subsequent to her 25 June 1995 injury, including the duties created for the position of distribution clerk, were not jobs readily available in the competitive job market; therefore, they do not constitute suitable employment and do not demonstrate plaintiff's wage earning capability. N.C. Gen. Stat. § 97-32. Further, plaintiff has shown that her inability to maintain continuing employment is due to her work-related injury; therefore, plaintiff has not constructively refused suitable employment. N.C. Gen. Stat. § 97-32; Seagraves v. Austin Co. of Greensboro,123 N.C. App. 228, 472 S.E.2d 587 (1996).
5. A change of condition is defined as a substantial change in the claimant's physical capacity to earn wages, occurring after a final award of compensation, different from that existing when the award was made.Bailey v. Sears Roebuck Co., 131 N.C. App. 649, 508 S.E.2d 831
(1998). In this case, plaintiff is not required to demonstrate a change of condition. Plaintiff has proven by the greater weight of the evidence that she has not regained her pre-injury wage earning capacity. Even if plaintiff has sustained a change of condition, the Form 18 filed by plaintiff for aggravation of her 25 June 1995 injury satisfies the requirements of N.C. Gen. Stat. § 97-47.
6. Plaintiff is entitled to the payment of weekly compensation in the amount of $133.12 from 3 June 1997 through the present and continuing until further Order of the Commission, with the exception of those periods of time during which she was employed by Elder Care and Hospice. During those periods of temporary, part time employment, plaintiff is entitled to temporary partial disability compensation in accordance with the Act. N.C. Gen. Stat. §§ 97-29; 97-30.
7. Plaintiff is entitled to the payment of all medical expenses incurred, or to be incurred, as a result of her injury by accident so long as it tends to effect a cure or give relief, including the performance of carpal tunnel release surgery. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff continuing total disability benefits at the rate of $133.12, from 3 June 1997 through the present and continuing until further Order of the Commission, with the exception of those periods of time during which she was employed by Elder Care and Hospice. During those periods of temporary, part time employment, plaintiff is entitled to temporary partial disability compensation equaling 2/3 of the difference between her pre-injury average weekly wage and her actual earnings in her part time employment. The accrued portion of this award shall be paid in a lump sum, subject to attorney's fees approved below.
2. Defendants shall pay all medical expenses incurred, or to be incurred by plaintiff, as a result of her injury by accident so long as it tends to effect a cure or give relief, including carpal tunnel release surgery.
3. A reasonable attorney's fee in the amount of 25% of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved for plaintiff's counsel. One fourth of the lump sum due plaintiff shall be paid directly to plaintiff's counsel. Thereafter, every fourth check shall be paid directly to plaintiff's counsel.
4. Defendants shall pay all costs.
This the ___ day of September, 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN